Filed 1/6/23  P. v. Mendiola CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B313404 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA151048) |
| v. | |
| JOSE MENDIOLA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kelvin D. Filer, Judge. Affirmed as modified and remanded with instructions.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, William H. Shin and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

After a jury trial, appellant Jose Mendiola was found guilty of murdering Alexiz Orona; conspiring to murder and attempting to murder Orona's boyfriend, Valentin Quintero; and shooting at an occupied motor vehicle. The jury found true various gang and firearm enhancements, and the court sentenced appellant to a total prison term of 70 years to life.

Appellant now raises several challenges to his convictions and sentence. He contends all his convictions must be reversed because the trial court erred in denying his *Batson/Wheeler*[1] challenge to the prosecution's peremptory strikes of young Hispanic prospective jurors. He further contends his murder conviction must be reversed because the court erroneously instructed the jury it could return a verdict without deciding on the degree, accepted such a verdict, and deemed the conviction one for second degree murder under Penal Code section 1157.[2] Appellant also contends the jury's true findings on the gang enhancements and gang-related firearm enhancements must be reversed in light of Assembly Bill No. 333 (2021-2022 Reg. Sess.; Stats. 2021, ch. 699) (AB 333), which amended Penal Code section 186.22 to require proof of additional elements to establish a gang enhancement and added section 1109, which requires trial of gang allegations to be bifurcated if the defense so requests.

With regard to his sentence, appellant contends the court erred in sentencing him pursuant to section 190, subdivision (d) in the absence of a jury finding that he shot Orona from a vehicle.

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258, overruled in part by *Johnson v. California* (2005) 545 U.S. 162 (*Wheeler*).
[2] All further statutory references are to the Penal Code unless otherwise indicated.

He further contends that Senate Bill No. 567 (2021-2022 Reg. Sess.; Stats. 2021, ch. 731, §§ 1.3, 3(c)) (SB 567) requires resentencing on the conviction for shooting at an occupied motor vehicle, because the court failed to make findings now required to sentence youthful offenders to the high term. Finally, he contends the court erred by imposing fines and fees without properly assessing his ability to pay them.

Respondent Attorney General concedes AB 333 requires remand for retrial of the gang and gang-related firearm enhancements, and SB 567 and related Assembly Bill No. 124 (2021-2022 Reg. Sess.; Stats. 2021, ch. 695) (AB 124) require remand for resentencing on the shooting count. We accept these concessions and agree that remand is required for these purposes. We further agree with appellant that the court erred in imposing sentence under section 190, subdivision (d). We accordingly vacate the gang and gang-related firearm enhancements, and remand the matter for resentencing. We otherwise reject appellant's claims, including his contention that section 1109 is retroactive, and affirm the judgment.

## PROCEDURAL HISTORY

On September 29, 2020, appellant was charged by amended information with the murder of Alexiz Orona (§ 187, subd. (a), count 1); conspiracy to commit murder (§§ 182, subd. (a), 187, subd. (a), count 2); attempted willful, deliberate, and premeditated murder of Valentin Quintero (§§ 187, subd. (a), 664, count 3); and shooting at an occupied motor vehicle (§ 246, count 4). The amended information alleged as to all counts that either appellant or a principal personally used a firearm (§ 12022.53, subds. (b), (e)(1)), personally and intentionally discharged a firearm (§ 12022.53, subds. (c), (e)(1)), and personally and

3

intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (d), (e)(1).) It also alleged that all counts were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C) (counts 1-3); § 186.22, subd. (b)(4) (count 4)), and counts 1, 2, and 3 were subject to sentencing under section 186.22, subdivision (b)(5).

Appellant proceeded to jury trial in September 2020.[3] The jury found appellant guilty of all counts, though it failed to specify a degree for the murder charge in count 1. The court later found the conviction was of the second degree pursuant to section 1157. The jury also found all the gang allegations true. On count 1, it found that a principal personally and intentionally discharged a firearm, causing death; it found that appellant did not personally do so. On count 2, the jury found true the allegations that appellant and a principal personally and intentionally discharged a firearm. On counts 3 and 4, the jury found true the allegations that appellant and a principal personally and intentionally discharged a firearm, causing death.[4]

The court sentenced appellant to an aggregate term of 70 years to life. On count 1, murder, the court sentenced appellant to 20 years to life pursuant to section 190, subdivision (d), plus a consecutive term of 25 years to life for the firearm enhancement;

---

[3] The amended information was filed after a pre-trial hearing. It added personal use firearm allegations to the original information filed January 30, 2020.
[4] Appellant does not challenge the seemingly inconsistent findings on the firearm enhancements.

the court struck punishment for the gang enhancement. On count 2, conspiracy to commit murder, the court sentenced appellant to 25 years to life, consecutive to the sentence on count 1. The court struck the firearm and gang enhancements on count 2. On count 3, attempted willful, deliberate, and premeditated murder, the court sentenced appellant to 25 years to life, but stayed the sentence pursuant to section 654. It also struck punishment for the gang and firearm enhancements. On count 4, shooting at an occupied vehicle, the court imposed the high term of seven years, to run concurrent to the sentences on counts 1 and 2. It struck punishment on the firearm and gang enhancements. The court imposed the minimum fines and assessments required by sections 1202.4, subdivision (b)(1), 1202.45, subdivision (a), 1465.8, and Government Code section 70373, subdivision (a)(1).

## FACTUAL BACKGROUND

Because the issues raised in this appeal are exclusively legal in nature, we provide only an abbreviated summary of the evidence the prosecution presented at trial. Appellant did not present any evidence; defense counsel argued that he acted in self-defense.

## I.     Appellant's Brother Martin is Killed

In 2016, appellant's 18-year-old brother, Martin Mendiola, belonged to the Sur Trece gang. On the evening of May 27, 2016, Martin[5] and fellow Sur Trece member Eduardo Prado were hanging out on West Raymond Street in Compton. Valentin Quintero, a member of the Barrio Trece gang who was dating Martin's ex-girlfriend Alexiz Orona, approached Martin and Prado, said "Barrio," and shot them both. Martin suffered a

---

[5]     For clarity, we refer to Martin by his first name.

gunshot wound to the head and died at the scene. Prado was shot in the neck but survived.

Prado initially told sheriff's deputies investigating the shooting that he did not know who the shooter was. More than a year later, after the events described below, he identified Quintero as the shooter. Prado also told law enforcement that appellant wanted to avenge Martin's death.

## II. Appellant Looks for Quintero

Appellant became a member of the Sur Trece gang in April 2017. On the afternoon of April 13, 2017, he went to Quintero's previous residence on East Raymond Street, said he was from Barrio Trece, and asked if Quintero was there. A current occupant of the home, a friend of Quintero's, said Quintero was not there, but gave appellant Quintero's phone number. The person also told Quintero that appellant was looking for him.

Appellant returned to Quintero's former residence later that night. One of the occupants covertly photographed appellant and his car and shared the photographs with Quintero. She also later shared them with law enforcement.

Appellant and Quintero exchanged numerous text messages over the next day; appellant asked for Quintero's location multiple times. Appellant also returned to Quintero's former residence a third time, on the morning of April 14, 2017; the occupants again told him that Quintero was not there.

## III. Non-Fatal Shootings

On the afternoon of April 13, 2017, Quintero and Orona went to the home of Sur Trece member Johnnyne Ramirez. Orona exchanged words with Ramirez before firing a gun at Ramirez and her girlfriend. Quintero urged Orona to "finish

6

them" before he and Orona drove away, but neither Ramirez nor her girlfriend sustained any injuries.

Later that day, appellant and Ramirez drove to an alley near the Buena Park home where Orona lived with her grandmother. Ramirez got out of the car and fired several shots into the backyard of the home, striking Orona's dog in the face. The dog survived, and the bullet recovered from its body and another from the scene were given to law enforcement.

## IV. Fatal Shooting

Quintero and Orona went to Quintero's former residence on April 14, 2017, after appellant had left. Melissa Moreno, who was seeking to buy a cell phone from Orona, arrived at the home in a car similar to appellant's. Moreno testified that Orona looked shocked when she arrived, and said she thought Moreno was Ramirez. Moreno drove Quintero and Orona to a nearby cell phone store to check the identification number on Orona's phone. While they were gone, appellant, Prado, and Ramirez arrived at Quintero's former residence in appellant's car. They parked on the street nearby and sat in the car. According to Prado, appellant was armed with a "22 revolver," Prado was armed with a "38," and Ramirez was armed with a "9mm."

Moreno, Quintero, and Orona returned about 30 to 40 minutes later. Moreno was driving, Orona was in the front passenger seat, and Quintero was in the back behind Orona. Moreno testified that as they neared the home, Orona said, "Babe, babe. That's the car." Quintero responded, "Shoot, momma, shoot," and Orona fired at appellant's car. Shots were returned immediately. Within seconds, the car was hit several times, and Orona slumped onto the dashboard.

Moreno drove to the hospital, where Orona was pronounced dead. A deputy medical examiner who performed an autopsy on Orona testified she sustained two shots, one to the armpit and one to the back. Both were fatal. A bullet and a bullet fragment were retrieved from Orona's body and given to law enforcement.

## V.     Investigation

After arresting Quintero on April 18, 2017 and searching his cell phone, law enforcement obtained a search warrant for appellant's cell phone subscriber information and certain location data. They located appellant on April 24, 2017 using cell phone location data and a ruse phone call.

Historic cell phone location data was consistent with appellant's and Ramirez's presence at Orona's home on April 13, 2017 and at the scene of the April 14, 2017 shooting.

Law enforcement searched appellant's home on April 26, 2017 and recovered loose 9mm ammunition and a revolver loaded with .32 caliber ammunition. They also recovered a t-shirt resembling the one appellant was photographed in while looking for Quintero at his former residence.

A senior criminalist examined bullets recovered from the Buena Park shooting, including the one from the dog; the bullet and bullet fragment retrieved from Orona's body; and a bullet core and fragment retrieved from the vehicle in which Orona was riding when she was shot. She determined that the bullets from the Buena Park shooting were consistent with bullets loaded into .32 auto caliber cartridges and were fired from the gun recovered from appellant's home. The bullet fragment from Orona's body was consistent with a 9mm caliber luger bullet. The criminalist was unable to determine the caliber of the other items she examined.

The prosecution introduced evidence that Sur Trece is a gang whose primary activities include possession of firearms, assaults, robberies, carjackings, attempted murders, murders, and drug sales. It also introduced evidence that four Sur Trece members were convicted of felonies after incidents in 2015 and 2017, and Sur Trece and Barrio Trece became rivals after Martin was killed. When presented with a hypothetical mirroring the facts of the case, the prosecution's gang expert opined that the April 14, 2017 shooting was gang-related and benefited the Sur Trece gang by bolstering its reputation for violence in the community.

## DISCUSSION

### I.     Batson/Wheeler

Appellant contends the trial court erred in denying his *Batson/Wheeler* motion during jury selection. He argues the prosecutor improperly dismissed three prospective jurors because they, like appellant, were young and Hispanic. He asserts the prosecutor failed to offer credible, non-discriminatory reasons for striking the jurors in question, and the trial court failed to make a sincere and reasoned inquiry into the prosecutor's asserted reasons. We conclude the trial court properly denied the motion.

#### A.     Background

Prior to the exercise of peremptory challenges in this case, the court and counsel questioned approximately 104 prospective jurors over the course of three days. On the fourth day, the court seated a group of 20 prospective jurors so the parties could exercise peremptory challenges.

With his first peremptory challenge, the prosecutor excused Panelist No. 3457. After the prosecutor's fourth peremptory challenge, with which the prosecutor excused Panelist No. 9846,

9

defense counsel requested a sidebar and made a *Batson/Wheeler* motion asserting that the prosecutor was impermissibly excusing "young, male Hispanics; the same demographic as my client." The court stated it did not think there was an "inference or pattern of discriminatory use of peremptory challenges, but out of abundance of caution" invited the prosecutor to state the reasons for the strikes.

The prosecutor stated that he struck Panelist No. 3457 because "he indicated that he had a problem with gang prosecution, a question I asked early on I believe of this group. Didn't get to follow up and delve into it more, but without more information that was a clear flag for me. And so based on that, based on that compared to everyone else - - and my preference is not to put people on a jury who have an issue with prosecuting gang members or gangs." The prosecutor gave the following explanation for striking Panelist No. 9846: "I don't have much information on him except I understand that he said he was a glazer at first and then he talked about installing glass and then he indicated that he cut hair for a hobby. . . . I had a defendant . . . back in Long Beach - - who was a glass installer and whatnot. And from just - - and obviously I can't generalize, but this is the only information I have. I didn't get a sense from him that he would have been a juror - - well, first of all, from that experience I just had a bad experience with him and learning things about that defendant who was itinerant and also . . . there's some profession[s] and people that sometimes have flags. For me that became a flag. [¶] And the other more obvious thing of the jurors remaining, the next juror is a juror who has had a verdict and I have much more information about. And so compared to that juror and this juror, I'd rather have the juror that's coming in."

10

Defense counsel asserted that these reasons were "bogus, made-up, manufactured excuses . . . that make absolutely no sense," and the prosecutor could have asked more questions if he needed more information. The prosecutor maintained that his reasons were non-discriminatory, and pointed out that there were "a few other[s] who fit that demographic . . . I'm planning to keep." Defense counsel responded that the standard was animus toward any one juror, and "I think we have that here." The court denied the motion, stating, "I don't think we have that here. It's non racial reasons provided for the exercise of the peremptory challenge. So the motion is denied. Thank you."

The parties continued exercising their peremptory challenges in alternating fashion. After each dismissed four additional prospective jurors, defense counsel objected to the prosecutor's request to dismiss Panelist No. 7903. She stated, "Your Honor, he keeps kicking off young Latinos. And this juror - - she has an uncle who is a lieutenant. She has friends that are part of the police department. And, again, this is just all racial animus toward kicking off anyone who could have any type of sympathy because of race for my client." The court again stated that it was "not finding a pattern has been established," but asked the prosecutor for his reasons so "the record [can] be clear." The prosecutor explained that Panelist No. 7903 "has a Facebook page which I was able to see and - - indicating a personality that is very opinionated. And although I will admit she hasn't posted since maybe 2015, 2016 but based on the comments on her Facebook page. Despite the fact that . . . I do like actually a lot of the things about her, I don't at this point feel comfortable keeping her based on that." He added that the panelist in line to replace

her was "someone who has had a verdict," and "I like those people."

The court stated, "I've heard enough. I think there's been . . . race neutral reasons. Most of the jurors here are Hispanics. Most of the proposed venire." The prosecutor then added that there were several panelists "who fit that profile" that he expected to remain on the jury "unless they're kicked by the defense." He further stated that he considered the personalities and experiences of the entire venire, and he "tend[ed] to be hesitant keeping" those with "strong personalities . . .especially when there's someone else who has already gone through the process and appears to have been able to come to verdict with other people." Defense counsel responded, "I again believe this is all made up. Looking at a Facebook page, you can't tell anyone's personality. He's just coming up with excuses because the reason he keeps kicking these people are young Latinos [*sic*] and he will continue to do it unless the court stops him." The court reiterated that the challenge was denied.

As jury selection progressed, the prosecutor made two *Batson/Wheeler* motions, alleging that defense counsel was impermissibly striking white and older Hispanic panelists. The court denied both motions.

After jury selection concluded, the prosecutor stated for the record that at least five of the 12 jurors in the box were young individuals who appeared to be Hispanic or Latino. The court stated that it had noted "six Latinos in the jury of twelve and five of our six alternates are Latino." The court also noted that four of the 12 jurors were Black, as was the remaining alternate.

12

## B.   Governing Law

"The law is clear and firmly established.  "'Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race.'" [Citation.]  "'Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution.'" [Citation.]  The law also recognizes "'a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination.'" [Citation.]  "A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges.  First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria.  Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge.  Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination.  [Citation.]  'The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant].'"'" [Citation.]" (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 759-760.)

"[W]here (1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror for the record, (3) the prosecutor provides nondiscriminatory reasons, and (4) the trial court determines

13

that the prosecutor's nondiscriminatory reasons are genuine, an appellate court should begin its analysis of the trial court's denial of the *Batson/Wheeler* motion with a review of the first-stage ruling." (*People v. Scott* (2015) 61 Cal.4th 363, 391 (*Scott*).)

At the first step, the defendant must set forth a prima facie case of discrimination "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." (*Scott*, *supra*, 61 Cal.4th at p. 383.) The bar is relatively low; "[i]t is satisfied simply by evidence sufficient to permit us to draw an inference that discrimination *may* have occurred." (*People v. Battle* (2021) 11 Cal.5th 749, 773.) The ultimate issue is not whether there is systematic exclusion of a protected class, but rather whether a particular panelist has been challenged on the basis of group bias. (*Ibid.*)

Applying the substantial evidence standard,[6] "[w]e examine the entire record before the trial court to determine whether it supports an inference of such group bias." (*People v. Battle*, *supra*, 11 Cal.5th at pp. 772-773.) Facts relevant to this showing include "that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of jurors belong." (*Scott*, *supra*, 61 Cal.4th at p. 384.)

---

[6] We reject appellant's suggestion that we should apply the de novo standard of review here because the trial court failed to make a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered. (*People v. Mai* (2013) 57 Cal.4th 986, 1048-1049.)

We also may consider nondiscriminatory reasons for the challenge that are "apparent from and 'clearly established' in the record." (*Ibid.*) We "may not rely on a prosecutor's statement of reasons to *support* a trial court's finding that the defendant failed to make out a prima facie case of discrimination." (*Id.* at p. 390.)

### C. Analysis

Appellant contends he established a prima facie case because he asserted his challenges immediately after Hispanic panelists were excused, he established that he was Hispanic, there was nothing in the panelists' voir dire responses that "supported excusal" by "suggest[ing] a bias against the prosecution," and the prosecutor failed to appropriately follow up on Panelist No. 3457's assertion that he had a problem with gang prosecutions. We disagree.

The record reflects that Hispanic panelists made up "most of" the approximately 104-person jury pool. A significant percentage of the jurors ultimately selected, either 40 or 50 percent, was Hispanic. Five of the six alternate jurors ultimately selected were Hispanic. Appellant's assertion that the prosecutor demonstrated racial animus by using three of his first four strikes on Hispanic panelists—one of whom appellant did not challenge at the time—is thus minimally persuasive. (See *People v Bonilla* (2007) 41 Cal.4th 313, 344 ["the statistical frequency with which the prosecution struck Hispanics from the juror pool provides no basis at all to infer discrimination" where frequency of strikes aligned with composition of panel].) Appellant demonstrated that he was Hispanic, but appears to disregard the racial identities of victims Quintero and Orona, both of whom the record suggests were also Hispanic.

15

All three panelists at issue stated during voir dire that they had never served on jury duty before. Lack of jury experience is a valid, nondiscriminatory reason to exercise a peremptory challenge. (See *People v. Manibusan* (2013) 58 Cal.4th 40, 83.) Panelist No. 7903 also stated that she was working two jobs while attending college. The prosecutor reasonably could conclude that such a busy panelist might not be the most attentive juror during this lengthy, complex case.

Appellant suggests that the prosecutor engaged the challenged jurors in only superficial voir dire. However, the record shows that he asked Panelist No. 3457 about prejudging the testimony of certain witnesses, his feelings about the concept of self-defense, and his feelings about gang prosecutions. The prosecutor asked Panelist No. 7903 about judging the credibility of witnesses by their occupations, whether she would be affected by displays of emotion or remorse, and whether she could follow instructions regarding self-defense. The prosecutor asked Panelist No. 9846 about judging the credibility of witnesses by their occupations, whether his verdict would be influenced by his feelings toward the victims, and whether he had any problems with the concept of coconspirator liability. By the time the prosecutor asked these questions, the panelists already had been questioned by the court and defense counsel; the court also placed time limits on both sides' questioning. The prosecutor's failure to specifically follow up with Panelist No. 3457 on the gang question does not on this record suggest desultory questioning or discrimination. Panelist No. 3457's generalized answer to the question likewise cannot be characterized as "explicitly race-tied." (Contra *People v. Silas* (2021) 68 Cal.App.5th 1057, 1099 [panelist's view that Black defendants are sentenced more

harshly was "explicitly race-tied" and did not constitute a nondiscriminatory reason dispelling an inference of bias].)

## II. Degree of Murder

### A. Background

Count 1 of the amended information charged appellant with murder of unspecified degree. The jury was instructed on both first and second degree murder, as well as the lesser included offense of voluntary manslaughter. One of the instructions, CALCRIM No. 520, stated, "If you decide that the defendant committed murder, it is murder of the second degree unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in INSTRUCTION 521." Another, CALCRIM No. 640, instructed the jury that it could consider first degree murder, second degree murder, and voluntary manslaughter "in whatever order you wish, but I can only accept a verdict of guilty or not guilty for second degree murder and voluntary manslaughter only if all of you have found the defendant not guilty of first degree murder and I can accept a verdict of guilty or not guilty of voluntary manslaughter only if all of you have found the defendant not guilty of both first and second degree murder. [¶] As with all of the charges in this case, to return a verdict of guilty or not guilty on a count, you must all agree on that decision." CALCRIM No. 640 further instructed the jury how to complete the verdict forms under various scenarios, including: "If all of you cannot agree whether the defendant is guilty of first degree murder, inform me that you cannot reach an agreement and do not complete or sign any verdict forms for that count," and "If all of you agree that the defendant is not guilty of first degree murder but cannot agree whether the defendant is guilty of second degree murder,

complete and sign the form for not guilty of first degree murder and inform me that you cannot reach further agreement. Do not complete or sign any other verdict forms for that count."

Defense counsel expressly agreed that CALCRIM No. 520 "looks fine." Defense counsel also agreed with giving CALCRIM No. 640 instead of CALCRIM No. 641 or 642, after expressing concern about past juror confusion over CALCRIM No. 641. At the conclusion of the jury instructions conference, the court asked counsel if there were further objections to the instructions. Both sides said there were none.

The jury was given one guilty verdict form and one not guilty verdict form for count 1. The guilty verdict form included a space for the jury to write in the degree of murder of which it found appellant guilty: "We further find it to be MURDER of the _____ degree." The jury was also given guilty and not guilty forms for the lesser included offense of voluntary manslaughter. There is no indication in the record that either the prosecutor or defense counsel objected to the verdict forms.

During deliberations, the jury sent a note to the court asking, "The instructions say leave the form blank? So do you want us to fill in the spaces or leave them blank. [¶] We put a tab on the instruction sections." The court "conferred with both counsel to get their suggestions and their input as to how we should respond," sent counsel a proposal, and expressly asked for objections before sending the following written response: "If you have found the defendant 'not guilty' of murder in count one, then sign the form for 'Not Guilty' as to that count. [¶] If you have found the defendant 'guilty' of murder in count one but cannot agree on whether it is 1st or 2nd degree, then sign the form for

18

'guilty' as to that count and leave the space blank where it asks for degree." Neither side objected.

The jury also sent a note stating, "If we find the defendant guilty of count 1, do we have to select 1 or 2nd degree murder? [¶] Also on the count 1 verdict form do we have to all agree on the true or not true answers." The court responded, in writing, "'YES' – your findings on the degree and the allegations must be unanimous. I have flagged the instructions." The jury sent a separate note stating, "We cannot agree on 1st or 2nd degree murder." The court provided the following written response: "If you have reached a unanimous verdict on any of the counts, sign the verdict forms for those counts. If you decide that the defendant committed murder, it is murder of the second degree unless the People have proved beyond a reasonable doubt that it is murder of the first degree. [¶] If you cannot agree whether it is first or second degree murder, then leave that space on the verdict form blank."

It is unclear in what order these questions were asked and answered, and the court's discussions with counsel occurred off the record. However, minute orders indicate that the court conferred with counsel as to all jury questions, and "both agree with the court's response." The court stated on the record that "everyone agreed in regards to their question about the form and I guess the degree of murder it appears they're making reference to."

After the jury indicated it had reached a verdict, the prosecutor notified the court he had "concerns about what the court was going to do in terms of its answer with regards to the jurors [*sic*] latest questions. Or question." The prosecutor explained that he had located, read, and shared with defense

19

counsel and the court *People v. Avalos* (1984) 37 Cal.3d 216 (*Avalos*), which gave him a "change of mind of how . . . the court should respond to the question that was asked by the jury." Specifically, he stated, "I think we could have just indicated to them that they have to have a unanimous decision as to the degree and left it at that. I'm just a little concerned about some of the language in the *Avalos* case given the current posture of where the jury was at the time."

Defense counsel stated that after reviewing *Avalos*, "I kind of agree with what he said. . . . I don't know how we interact in a situation when the jury is hung as to the degree of murder. But that's what this case says. So probably they should have been brought out, inquired whether they were hung and then for the court to take – if they were hung – to take the hand or whatever was necessary for the court to assist them." The prosecutor then stated that he was "not sure whether or not they mean they have a verdict except for the degree of murder or whether, you know, they actually came to some sort of agreement. My concern is if they think they have a verdict as to count 1 but they have not agreed on the degree, I'm concerned about the legal effect of that."

The court responded that "if they can't agree on the degree of murder, then it's going to be deemed to be second degree murder pursuant to Penal Code section 1157."[7] The court added

[7]     Section 1157 states: "Whenever a defendant is convicted of a crime or attempt to commit a crime which is distinguished into degrees, the jury, or the court if a jury trial is waived, must find the degree of the crime or attempted crime of which he is guilty. Upon the failure of the jury or the court to so determine, the degree of the crime or attempted crime of which the defendant is guilty, shall be deemed to be of the lesser degree." Notably, as

20

that it had not wanted to influence the jury when answering its questions. It continued, "If anything, it should be favored towards the – giving the defendant the benefit of the doubt which is why I included the first part if you find the defendant not guilty in count 1, then sign the verdict form not guilty as to that count. And then if you find the defendant guilty, then you should sign the guilty form. But if you can't agree on first or second degree, you don't put anything because they could not agree. Obviously that's where 1157 kicks in. If they cannot agree then it's murder of the second degree. I mean, I don't know what other option we could have given them."

Defense counsel responded, "No." The court then reiterated, "We had to answer their question," to which defense counsel responded, "Yes." The court then stated that it found *Avalos* distinguishable, because there the court "gave them a different instruction, additional instruction. Then the court offered to provide separate verdict forms for the three possible findings in this case. That's totally different from what we did. All I did is reiterate really what was contained in the instruction they already had and that is murder is murder of the second degree unless the People have proven it's murder in the first degree. [¶] And so if they don't fill out that form, my intention at

discussed more fully below, *Avalos* expressly reiterates the Supreme Court's earlier holding that section 1157 "was not intended to apply to cases in which the jury does not fix the degree of a crime because it cannot reach a unanimous verdict on that issue." (*Avalos, supra,* 37 Cal.3d at p. 220; see also *id.* at p. 228 ["it is improper for a trial court to instruct a jury that it can avoid reaching a unanimous verdict on the question of degree by returning a general verdict finding the defendant guilty of an unspecified degree of murder"].)

21

the time of sentencing would be to deem that it's murder of the second degree which is what we do if that's the case."

The court then invited defense counsel to respond. She stated, "the way I read *Avalos*, it doesn't really need any rule for when the jurors are hung and that was what I was concerned about. So if the jurors are hung, there has to be a mechanism for that to happen." The court stated, "the verdict form says that if they found him guilty of murder, then they would decide the degree." After defense counsel agreed, the court continued, "they only get to the degree if they find him guilty of murder." Defense counsel said, "Correct. So if they are hung on the degree of murder, there has to be a mechanism for that to happen, right?" The court said "Yes, section 1157." Defense counsel responded, "Okay." The court then quoted section 1157, and defense counsel said, "That was my understanding."

The court asked defense counsel what she was "asking or suggesting that I could have done other than what I did which was just reiterate what the law says?" Defense counsel responded, "I wish I had just thought about requesting that they be brought back, questioned. But obviously now they've reached a verdict; so that might be too late. But . . . I think if they can't agree on the degree of it, they can't agree on the degree of it, and that is what happens. You're right." The court asked the prosecutor if he had anything further; he did not.

After a recess, however, the prosecutor raised the issue again, asking if it was the court's and defense counsel's understanding that the jury's failure to designate a degree would result in a conviction for second degree murder. The court said it was, and the prosecutor said he did not "have a quibble with it" "so long as counsel and the court are on the same page about

that."  Defense counsel responded, "The instruction specifically tells them if it's not of the first degree then it's of the second degree."  The court then asked both sides if they had anything further; neither did.

The following day, before the jury was brought to the courtroom for the verdict to be read, the prosecutor raised the issue a third time, indicating he had "misgivings about the *Avalos* case."  He explained, "I don't want us to have instructed the jury the way that we have and to receive the verdicts the way that we have and later on for the defense to argue that . . . if the jury has not come back with a decision on the degree of murder then in fact that is a hang on the entire count of count 1."  The court asked the prosecutor if he had any cases that "even come[ ] close to saying that."  The prosecutor clarified he was not arguing for any particular outcome, but rather expressing "concern [that] an argument can be made that . . . if they don't come back with the degree of murder that this is a mistrial or that's a hang, mistrial on that complete count and the People would have the burden to retry the entire count."  The court responded, "I don't think there's any case to say that.  Not the way the verdict forms are made out.  The situation in that case [presumably *Avalos*] is not the type of verdict forms we used."  The prosecutor reiterated his concern about the potential need to retry the entire count, and added, "That's why I think if it is in fact blank we need to go through the - -"  Before he finished, the court interjected, "No. That's not going to happen. I know exactly what I'm going to do if that happens.  I'm not going to ask them if they want to deliberate further on that.  Absolutely not.  I will ask them what the tally was if we reach that point."

23

The prosecutor responded that he wanted "to be clear so counsel has an opportunity to make a record one way or the other." After the court interjected that the prosecutor had "made it an issue now," the prosecutor specifically requested that the court direct further deliberations if the jury failed to reach a verdict on the degree. The court asked defense counsel if she wanted to be heard. After she said "no," the court ordered the jury brought to the courtroom for the verdicts to be read.

On count 1, the jury completed the guilty form for murder but left the degree line blank. After polling the jury and ordering the verdicts recorded, the court at the prosecutor's request asked the jury foreperson what the jury's vote had been on the degree. The foreperson answered that 11 jurors voted for first degree and one voted for second degree. Neither the prosecution nor the defense made any further statements on the issue. At sentencing, the court deemed the conviction on count 1 to be for second degree murder pursuant to section 1157. No objections were raised.

**B. Contentions**

Appellant now contends the court erred in instructing the jury it could reach a verdict on the murder charge without specifying a degree, and in accepting the verdict of unspecified degree. He contends the error is structural and requires reversal of his murder conviction. Appellant asserts the issue is preserved for review either because no objection was required or because his counsel "agreed with the prosecutor's claim that the trial court's handling of the jury's inability to reach a unanimous verdict on the degree was incorrect." He alternatively contends that his trial counsel rendered ineffective assistance to the extent she failed to preserve the claim. Respondent acknowledges the

24

verdict "arguably did not comply with 1157 by failing to further state a unanimous verdict as to first degree murder," but contends defense counsel invited the error.  In reply, appellant asserts respondent "misconstrues the record," and defense counsel sufficiently questioned the court's procedure to preserve the issue for appeal.

### C.    Analysis

We agree with respondent that the invited error doctrine precludes substantive review of this issue.

"'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest.  If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. . . .  [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.'" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49.)  "In cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose to be sufficient to invoke the invited error rule." (*Ibid.*)

*Avalos*, *supra*, 37 Cal.3d 216 is instructive.  In *Avalos*, as here, the defendant was charged with one count of murder.  (*Id.* at p. 221.)  During deliberations, the jury "inquired whether if they had determined that defendant was guilty of murder but disagreed upon the degree, they would have reached a verdict of guilty of second degree murder or no verdict at all.  The jury further indicated that it was 'unable to agree unanimously on which degree of murder the defendant is guilty of.'" (*Id.* at p. 222.)  As here, the record indicated that the court and counsel conferred off the record and agreed the jury should be instructed to reexamine two instructions previously given.  (*Id.* at p. 223.)

25

Later that day, as deliberations continued, the court stated that it believed its response had been inadequate and instructed the jury that it could return a verdict "as to those portions of the murder verdict upon which they unanimously agreed." (*Ibid.*) The court then provided the jury with separate verdict forms for (1) guilt on the count; (2) degree of murder; and (3) firearm enhancements. (*Ibid.*) Defense counsel did not object, though the prosecutor "asked to place in the record that the legal basis for the court's decision was Penal Code section 1157." (*Ibid.*) "Defense counsel said nothing on the record at this point." (*Ibid.*)

The jury subsequently returned a verdict of guilty on the murder count, and findings of true on the firearm allegations. It stated it was divided seven to five on the degree of murder, however, and that future deliberations were unlikely to resolve the impasse. (*Avalos, supra,* 37 Cal.3d at p. 223.) Both counsel declined a jury poll, and the court entered the verdict. (*Ibid.*) At the sentencing hearing, defense counsel emphasized that the defendant had not been convicted of premeditated murder and argued that the court should "make sure that it's second degree." (*Id.* at p. 224.) The court subsequently invoked section 1157 and deemed the conviction to be for second degree murder. (*Ibid.*) On appeal, the defendant argued "for the first time that the trial court committed error when it told the jury that it might return a verdict which did not specify the degree of murder and then applied section 1157 to fix the degree at second." (*Ibid.*)

The Supreme Court agreed that the court erred by applying section 1157. Relying upon and reiterating its previous decision in *People v. Dixon* (1979) 24 Cal.3d 43 (*Dixon*), it explained that section 1157 "'should apply only to situations in which the jury has neglected to fix the degree, and not to situations in which

express disagreement among the members of the jury on the matter of degree has precluded it from achieving unanimity.'" (*Avalos*, *supra*, 37 Cal.3d at p. 225.) The court observed that section 1157 "'used the word "failure" solely in the sense of omission to perform and not in the alternative sense of inability to achieve success,'" and that "a contrary conclusion would lead to 'absurd results, in which a clear minority favoring a lesser degree could effectively prevail over a clear majority favoring the greater degree.'" (*Id.* at p. 226.)

The court further concluded, however, that the invited error doctrine precluded reversal of the defendant's conviction. The court observed that "the court was led into error by counsel for both the people and the defense, and . . . the defense took full advantage of the tactical benefit made available by the court's error." (*Avalos*, *supra*, 37 Cal.3d at p. 220.) The court concluded that "defense counsel's actions taken as a whole, and particularly his argument at the time of sentencing, show that his lack of objection to the proposed instruction was more than mere unconsidered acquiescence. Counsel had participated in a discussion of the proper response to the jury's request for further instruction. He agreed to the proposed instruction and made no objection to the verdict which followed. At sentencing counsel urged the court to enter a verdict in accord with the erroneous theory on which the instruction was based. Although this argument came later in time than the error, it shows that counsel had a deliberate tactical purpose for accepting the instruction and the verdict based upon it. Counsel thereby avoided subjecting defendant to a new trial at which he might possibly have been convicted of a more serious offense than second degree murder." (*Id.* at p. 229.)

*Avalos* is virtually indistinguishable from the instant case. Here, defense counsel agreed to the jury instructions stating that murder was second degree unless the prosecution proved otherwise. She did not object to the verdict forms, and expressly agreed with the court's responses to the jury's numerous questions. When the prosecutor raised *Avalos* the first time, defense counsel equivocally said she "kind of" agreed with the prosecutor that perhaps the jury should have been questioned about a potential deadlock. However, when the prosecutor raised the issue for a second and then a third time, defense counsel agreed with the court that section 1157 would cure any infirmity in the verdict. Even after the prosecutor raised the specter of a possible mistrial, suggested making further inquiry of the jury if necessary, and specifically invited defense counsel to take "an opportunity to make a record one way or the other," defense counsel expressly declined to be heard on the issue. Taken as a whole, particularly in light of counsel's aggressive objections throughout trial, self-described strategy of disputing "every single thing in this case," and the repeated, time-separated opportunities counsel had to review the issue and make objections, the record shows that counsel's lack of objection on this issue was more than mere unconsidered acquiescence.

Appellant contends there cannot have been a tactical purpose behind defense counsel's conduct, because "a hung jury is preferable to a conviction." We disagree. As the *Avalos* court recognized, "the defense in fact made a tactical decision that the erroneous instruction and the resulting verdict of second degree murder would be more advantageous to the defendant than a mistrial and subsequent retrial on the charge of first degree murder." (*Id*. at p. 228.) The tactical nature of that decision is

28

underscored here, where the jury split 11-1 in favor of first degree murder, found appellant guilty of conspiring to commit murder and attempted premeditated murder, and found true numerous personal use firearm enhancements.

We accord great deference to tactical decisions by counsel, which are generally not found reversible in the context of ineffective assistance of counsel claims. (*People v. Stanley* (2006) 39 Cal.4th 913, 954.) To establish counsel was ineffective, appellant must show both that trial counsel's representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms and that he was prejudiced such that but for counsel's deficient performance, the outcome of the proceeding would have been different. (*People v. Mai*, *supra*, 57 Cal.4th at p. 1009.) We presume counsel acted within the wide range of reasonable professional assistance (*ibid.*) and appellant has given us no reason to depart from that presumption here.

## III. Gang and Gang-Related Enhancements (AB 333)

While this appeal was pending, the Governor signed AB 333 into law, amending section 186.22 and adding section 1109, effective January 1, 2022. Appellant contends, and respondent agrees, that the amendments AB 333 made to section 186.22 apply retroactively to this case. Appellant also contends that section 1109, as enacted by AB 333, applies retroactively to this case and compels a reversal of his convictions. Respondent disputes this contention. We review the question of retroactivity de novo. (*In re David C.* (2020) 53 Cal.App.5th 514, 519.)

We agree with the parties that the substantive amendments to section 186.22 are retroactive and require the jury's findings on the gang allegations and firearm allegations

29

predicated thereon to be vacated.  We remand the matter to afford the prosecution the opportunity to retry these allegations, should it choose to do so.  We reject appellant's remaining contention concerning section 1109.

### A.    Amendments to section 186.22

As relevant here, section 186.22 provides enhanced punishment for defendants convicted of a felony "committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members."  (§ 186.22, subds. (b)(1), (b)(4).)  The version of section 186.22 in effect at the time of appellant's trial defined a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f).)  It defined "pattern of criminal gang activity" as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following [listed] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons."  (Former § 186.22, subd. (e).)

AB 333 narrowed both these definitions, effectively heightening the prosecution's burden to prove the enhancement

applies.  (See *People v. Tran* (2022) 13 Cal.5th 1169, 1207 (*Tran*).)  Under the current version of section 186.22, a "criminal street gang" is defined as "an ongoing, *organized* association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e) [a shorter list than previously], having a common name or common identifying sign or symbol, and *whose members collectively engage in*, or have engaged in, a pattern of criminal gang activity."  (§ 186.22, subd. (f), emphasis added.)  The statute also more narrowly defines "pattern of criminal gang activity" as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior *offense and within three years of the date the current offense is alleged to have been committed*, the offenses were committed on separate occasions or by two or more *members*, *the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational.*"  (§ 186.22, subd. (e)(1), emphases added.)

In light of the amendments, "imposition of a gang enhancement [now] requires proof of the following additional requirements with respect to predicate offenses:  (1) the offenses must have 'commonly benefited a criminal street gang' where the 'common benefit . . . is more than reputational'; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang

31

members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 345, quoting § 186.22, subds. (e)(1)-(2).) The statute also sets forth examples "of a common benefit that are more than reputational," which include "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

The parties agree, and our Supreme Court has held, that these changes ameliorate punishment and thus apply retroactively to all cases not yet final as of the statute's January 1, 2022 effective date. (See *Tran*, *supra*, 13 Cal.5th at pp. 1206-1207, citing *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).) "When a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error." (*Id*. at p. 1207.) Here, respondent concedes reversal is required, reasoning that the evidence presented at trial failed to establish that the predicate offenses commonly benefitted the gang in a way that was more than merely reputational, as required by section 186.22 as newly amended. We agree. On this record, reversal of the gang enhancements is required, and the prosecution must be given the opportunity to establish the additional elements on remand, should it choose to do so.[8] (See *People v. Eagle* (2016) 246 Cal.App.4th 275, 280.)

---

[8] We note that the court struck punishment for each of the gang enhancements. Should the prosecution successfully retry

The same rationale applies to the jury's findings on the section 12022.53, subdivision (e)(1) firearm allegations, which require findings under section 186.22, subdivision (b).  (See *People v. Lopez, supra*, 73 Cal.App.5th at pp. 346-348.)  Section 12022.53, subdivision (e)(1) provides for enhanced firearm penalties for "any person who is a principal in the commission of an offense" if the prosecution pleads and proves that (1) the person violated section 186.22, subdivision (b), and (2) any principal in the offense committed a firearm violation specified in section 12022.53, subdivisions (b), (c), or (d). (§ 12022.53, subd. (e)(1).)  Here, the jury found section 12022.53, subdivision (e)(1) allegations true on all four counts.  Because this enhancement depends on a finding that the principal was "convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" as set forth in section 186.22, subdivision (b) (§ 12022.53, subd. (e)(1)(A)), the changes to section 186.22 made by AB 333 require that the true findings on these enhancements, too, be vacated and the matter remanded to the trial court.

We note, however, that with respect to all charges except the murder of Orona, the jury separately found true allegations that appellant personally and intentionally discharged a firearm (count 2, conspiracy to commit murder) or "personally and intentionally discharged a firearm . . . which proximately caused bodily injury and death to Alexiz Orona" (counts 3 and 4, attempted murder and shooting at an occupied vehicle).  These findings, which appellant does not challenge, remain intact.

the gang allegations, the court is not bound by these previous sentencing choices.

33

**B.     Section 1109**

In addition to amending section 186.22, AB 333 added section 1109, which requires trial of gang enhancement allegations to be bifurcated from trial of the underlying offenses if the defendant so requests.  (See § 1109, subd. (a).)  Appellant requested bifurcation here, but the trial court denied the request.  He now contends that his convictions must be vacated and the offenses retried separately from the gang allegations, because section 1109 applies retroactively under *Estrada*, *supra*, 63 Cal.2d 740.  We agree with respondent that the exception provided in *Estrada* does not apply to section 1109, and the statute does not apply retroactively to this appeal.  We further conclude that even if section 1109 does apply retroactively, the failure to bifurcate was harmless here.

Our Supreme Court has explained that *Estrada* "established an exception to the general rule that no part of the Penal Code is retroactive.  (§ 3 [no part of the Pen. Code is retroactive 'unless expressly so declared']; [citation].)  In *Estrada*, we held that 'where [an] amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed.'  [Citation.] [¶] . . . *Estrada* represents 'an important, contextually specific qualification to the ordinary presumption that statutes operate prospectively:  When the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date.'  [Citation.]"  (*People v. Hajek and Vo*

34

(2014) 58 Cal.4th 1144, 1195-1196 (*Hajek*), overruled on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192.)

The *Estrada* presumption applies where an amended statute mitigates or eliminates punishment for a criminal offense or enhancement. (*People v. Buycks* (2018) 5 Cal.5th 857, 882; *Estrada, supra,* 63 Cal.2d at pp. 743-744; *Hajek, supra,* 58 Cal.4th at p. 1196; see also *People v. Wright* (2006) 40 Cal.4th 81, 95–96 [*Estrada* applied to statute creating a new affirmative defense]; *People v. Babylon* (1985) 39 Cal.3d 719, 721-722, 728 [*Estrada* applied to statute narrowing class of prohibited acts]; *People v. Frahs* (2020) 9 Cal.5th 618, 631 [*Estrada* applied to statute that offered "a potentially ameliorative benefit for a class of individuals"].)

The Courts of Appeal are currently split as to whether section 1109 applies retroactively to nonfinal judgments, and the Supreme Court declined to resolve the matter in *People v. Tran, supra,* 13 Cal.5th at p. 1208. (Compare, e.g., *People v. Montano* (2022) 80 Cal.App.5th 82, 105-108 [§ 1109 applies retroactively]; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128-1131 [same]; *People v. Burgos* (2022) 77 Cal.App.5th 550, 564-568, rev. granted July 13, 2022, S274743 [same]; with *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, rev. granted Aug. 17, 2022, S275341 [§ 1109 does not apply retroactively]; *People v. Perez* (2022) 78 Cal.App.5th 192, 207, rev. granted Aug. 17, 2022, S275090 [same].) We agree with the courts that have held *Estrada* does not apply to section 1109.

Section 1109 does not reduce or eliminate punishment for an offense or enhancement, provide a new affirmative defense to a charged crime, or otherwise ameliorate the punishment for a class of individuals. It modifies trial procedures for defendants

35

who have been charged with a gang enhancement and choose to request a bifurcated trial. When used in an appropriate case, section 1109 will require adjudication of a defendant's guilt of an underlying offense before further adjudicating "the question of the truth of the [gang] enhancement." (§ 1109, subds. (a)-(b).) The *Estrada* presumption does not apply to this type of procedural rule.

We are not persuaded otherwise by appellant's alternative contentions that section 1109 must be applied retroactively to ensure equal protection of the laws and receipt of due process. As appellant acknowledges, "[t]he instant case does not involve a classification scheme in which persons, or classes of persons, are expressly treated differently." There is thus no basis to apply strict scrutiny here, as appellant urges. Moreover, there is a rational basis for applying section 1109 prospectively: "[r]equiring retrial of the substantive offenses in every case in which there were gang allegations would be both disruptive and wasteful of judicial resources." (*People v. Burgos*, *supra*, 77 Cal.App.5th at p. 575 (dis. opn. of Elia, J.).) Appellant claims his due process rights were violated by a "unitary trial in which prejudicial gang evidence [was] presented." Yet the court expressly instructed the jury that it could consider the gang evidence only for limited purposes, and could "not conclude from this evidence that a defendant is a person of bad character or that he has a disposition to commit crime." (CALCRIM No. 1403.) We presume the jury followed this limiting instruction regarding its consideration of the gang evidence, which appellant has not challenged. (See *People v. Ramos*, *supra*, 77 Cal.App.5th at p. 1132; *People v. Burgos*, *supra*, 77 Cal.App.5th at p. 574 (dis. opn. of Elia, J.).)

36

In any event, the failure to bifurcate gang allegations does not constitute structural error.  (See *Tran*, *supra*, 13 Cal.5th at p. 1208.)  Even if we were to apply section 1109 retroactively, we would conclude the failure to bifurcate the gang allegations was harmless under both the standards of *People v. Watson* (1956) 46 Cal.2d 818, 836 and *Chapman v. California* (1967) 386 U.S. 18, 24.

First, as the trial court recognized when it denied appellant's motion to bifurcate, a large portion of the gang evidence would have been admitted in the first stage of any bifurcated trial.  Such evidence was relevant at minimum to explain appellant's relationship and history with Quintero and Orona, his relationship with alleged coconspirators Prado and Ramirez, and his motive for committing the crimes.

Second, any gang evidence that was introduced for purposes other than establishing motive was relatively sanitized.  To prove that Sur Trece was a criminal street gang within the meaning of former section 186.22, the prosecution introduced certified court dockets in which other Sur Trece members had been convicted of predicate offenses no more serious than those charged here, which did not bear on appellant's criminal conduct.  Third, as noted above, the jury was instructed not to use any gang evidence to conclude appellant had bad character or was disposed to commit crime.  Absent any showing by appellant to the contrary, we presume the jurors followed these instructions. (*People v. Krebs* (2019) 8 Cal.5th 265, 335; see also *People v. Ramos*, *supra*, 77 Cal.App.5th at p. 1132 ["the jury was given a limiting instruction regarding its consideration of the gang evidence, which we presume it followed"].)

37

Finally, there was compelling evidence of appellant's guilt beyond use of gang evidence in this case. Approximately one year after his brother was killed, appellant began actively hunting for Quintero, whom he believed was the assailant. Text messages between appellant and Quintero and appellant and his coconspirators documented these efforts. Cell phone data, along with eyewitness testimony and photographic evidence, placed him not only at the scene of the shooting but also at Quintero's former residence and Orona's Buena Park home. A gun used in the Buena Park shooting was found during a search of appellant's home, and ballistics evidence from the fatal shooting was consistent with ammunition found in appellant's home. In light of the foregoing, we find no reasonable probability of a different result in a bifurcated trial, and find any purported error harmless beyond a reasonable doubt.

## IV.    Sentence for Murder (§ 190, subd. (d))

As discussed above, appellant was found guilty of second degree murder. Pursuant to section 190, subdivision (a), the default punishment for second degree murder is 15 years to life. (§ 190, subd. (a).) Section 190, subdivision (d) increases the punishment for second degree murder to 20 years to life "if the killing was perpetrated by means of shooting a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict great bodily injury." (§ 190, subd. (d).) The trial court imposed a sentence of 20 years to life pursuant to section 190, subdivision (d), citing its "recollection [that] defendant was inside the car when he fired those shots."[9]

---

[9]    The court appears to have considered section 190, subdivision (d) sua sponte; it was not mentioned in the prosecutor's sentencing memorandum.

Defense counsel objected that was "not a jury finding," but the court overruled the objection.

Appellant now contends the court erred in imposing the heightened sentence, because no section 190, subdivision (d) allegation was pled in the amended information or found true by the jury. Respondent acknowledges "[t]he information did not mention section 190, or include a specific allegation as to count 1 that the killing was perpetrated by means of shooting a firearm from a motor vehicle," "[t]he jury instruction as to second degree murder did not include an allegation that appellant fired from a motor vehicle," and "the verdict form as to count 1 did not mention an allegation regarding shooting from an occupied motor vehicle." It nevertheless contends any error was harmless beyond a reasonable doubt. Upon de novo review of this legal question, we agree with appellant that the sentence was improper. (See *People v. Tua* (2018) 18 Cal.App.5th 1136, 1140 [unauthorized sentence], *People v. Cromer* (2001) 24 Cal.4th 889, 894.)

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 490.) Similarly, any fact that increases the mandatory minimum sentence also must be submitted to a jury and proved beyond a reasonable doubt. (*Alleyne v. United States* (2013) 570 U.S. 99, 103.) "As a rule, all sentence enhancements 'shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact.'" (*People v. Anderson* (2020) 9 Cal.5th 946, 953, quoting § 1170.1, subd. (e).) Failing to submit a sentencing factor to the jury is not structural error, however, and does not require reversal if the error is found

to be harmless beyond a reasonable doubt. (*Washington v. Recuenco* (2006) 548 U.S. 212, 222.)

Here, there is no dispute that the jury was not asked to find and did not find that appellant shot from a motor vehicle. Respondent contends this omission was harmless because "the information put appellant on notice, the jury instructions specifically advised appellant he faced a first degree murder conviction if the murder was committed from a motor vehicle, [ ] there was no dispute that the shooting occurred from a motor vehicle," and "the jury found true the allegation that a principal personally discharged a firearm causing death." We reject these contentions.

First, as discussed above, the jury's finding that a principal discharged a firearm and caused death is no longer valid in light of AB 333, a point respondent conceded. It is unclear in any event how a finding that a principal discharged a firearm implies or even suggests that appellant shot a firearm from a motor vehicle. Second, the jury was instructed that appellant would be "guilty of first degree murder if the people have proved that the defendant murdered by shooting a firearm from a motor vehicle." (CALCRIM No. 521.) As discussed above, the jury did not find appellant guilty of first degree murder. Absent some showing to the contrary, we presume the jury followed the instructions and did not fail to convict appellant of first degree murder despite finding he shot a firearm from a motor vehicle. (*People v. Krebs*, *supra*, 8 Cal.5th at p. 335.) Moreover, the instruction only gave appellant notice that he could be convicted of first degree murder, not that his sentence for second degree murder could be enhanced.

40

Third, the information generically charged appellant with murder; no degree was specified. Respondent asserts without explanation that such a charge "was adequate to advise appellant his sentence could be increased if found guilty of second degree murder and to have fired from a motor vehicle, and also that such finding would elevate the crime to first degree murder." Respondent cites *People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1237-1238 (*Valenzuela*), but the case is distinguishable.

In *Valenzuela*, the defendant was charged with first degree murder. (See *Valenzuela*, *supra*, 199 Cal.App.4th at p. 1217.) During discussion of jury instructions, the court advised the parties it planned to instruct on the lesser included offense of second degree murder. (*Id*. at 1236.) The court noted that it had also added an instruction for section 190, subdivision (d), and explained, "I understand that normally it's something that would have to be pled and proved in the information. But because we're dealing with the lesser-included offense and what was charged originally, was first-degree murder, obviously, the allegation wasn't there. I assume neither of you has any objection to me instructing on it or including it in the verdict form." (*Ibid*.) Defense counsel expressly stated, "No objection, your honor." (*Ibid*.) The jury found the defendant guilty of second degree murder and found that he fired from a motor vehicle. The trial court sentenced him to 20 years to life pursuant to section 190, subdivision (d). (*Id*. at p. 1237.) The defendant then challenged the section 190, subdivision (d) allegation on appeal, arguing he lacked notice because it was not charged in the information. (*Id*. at p. 1236.) The appellate court rejected this argument, finding there was no question that defendant was on notice that he could be convicted of a lesser offense, and that his counsel plainly

41

consented to the jury's consideration of the special allegation. (See *id*. at pp. 1237-1238.)

Here, the generic murder charge certainly gave defendant notice that he could be convicted of second degree murder. No enhancements related to second degree murder were alleged, however, and counsel did not consent to asking the jury to make any findings pursuant to section 190, subdivision (d). The jury also made no such findings, further distinguishing this case from *Valenzuela*.

Respondent finally contends the error is harmless because it was undisputed that appellant fired from a motor vehicle. Respondent points to appellant's opening statement, in which his counsel asserted, "Now, the truth is the instant Valentin Quintero, sitting in some third party's car with no care about them, same as Alexiz, orders and tells Alexiz to shoot, and she does shoot, the occupants of the white car shoot back in self-defense." It also points to her closing argument, in which she contended, "the people in the white car had every right to shoot back." Neither opening statements nor closing arguments are evidence, however, and stating that appellant was "in" or an "occupant of" the car does not preclude him stepping outside the stationary vehicle. Indeed, the actual evidence presented on the point was unclear. While it certainly could be inferred from Moreno's testimony that the shots were fired from inside the parked car as she drove past, she testified that she did not look toward the car as the shots were being fired. Prado told detectives that appellant "hopped out" or "came out the car shooting" after shots were fired at them. The jury was not required to believe this statement, but it certainly could have.

42

In short, on the record before us, we cannot conclude that the jury's failure to find that appellant shot from a motor vehicle was harmless beyond a reasonable doubt. We accordingly order the sentence on count 1 modified from 20 years to life to 15 years to life.

## V. Sentence for Shooting at an Occupied Vehicle (SB 567 & AB 124)

Appellant contends his upper term sentence on count 4 for shooting at an occupied vehicle may no longer be proper in light of recent, retroactive amendments to section 1170. Respondent concedes the statutory changes are retroactive and remand for resentencing is necessary.[10] After a de novo review, we agree. (See *In re David C., supra*, 53 Cal.App.5th at p. 519.)

"Effective January 1, 2022, our determinate sentencing law, section 1170, was amended in several fundamental ways. (See Sen. Bill No. 567 (2020–2021 Reg. Sess.); Stats. 2021, ch. 731, § 1.3; Assem. Bill No. 124 (2020–2021 Reg. Sess.); Stats. 2021, ch. 695, § 5.)" (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1038 (*Flores*).) SB 567 amended section 1170, subdivision (b) to authorize determinate sentences above the middle term "only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a

---

[10] We note that appellant's opening brief discusses only SB 567, while respondent's brief discusses only AB 124. In his reply brief, appellant acknowledges that both bills contemporaneously amended section 1170, and notes that the parties agree remand for resentencing is necessary.

court trial." (§ 1170, subd. (b)(2).) Additionally, it added language requiring aggravating circumstances to be bifurcated from trial of the charges, and mandates that the jury "not be informed of the bifurcated allegations until there has been a conviction of a felony offense." (*Ibid.*)

Meanwhile, AB 124 made a low-term sentence presumptively appropriate under specified circumstances, including where a defendant was a "youth" as defined section 1016.7, subdivision (b) at the time of the offense, unless the court finds that imposition of the low term would be contrary to the interests of justice. (See § 1170, subd. (b)(6)(B); *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1095 (*Gerson*).) Section 1016.7, subdivision (b) defines "youth" as "any person under 26 years of age on the date the offense was committed." Appellant was 20 years old on April 14, 2017.

The parties agree that the changes SB 567 and AB 124 made to section 1170 apply retroactively because they are potentially ameliorative with respect to punishment and appellant's conviction is not final. We agree. (*Flores*, *supra*, 73 Cal.App.5th at p. 1039; *Gerson*, *supra*, 80 Cal.App.5th at p. 1095; see *Estrada*, *supra*, 63 Cal.2d 740.) Upon resentencing appellant, the trial court should consider the ameliorative changes effected by SB 567 and AB 124.

## VI.    Fines and Fees

At sentencing, the court imposed a $40 court operations assessment on each count (§ 1465.8), a $30 criminal conviction facilities assessment on each count (Gov. Code, § 70373), and the minimum restitution fine of $300 (§ 1202.4, subd. (b)(1)). It also imposed and stayed the minimum parole revocation fine of $300. (§ 1202.45, subd. (a).) The court told appellant, "Those

44

mandatory fines, fees can be collected from your prison earnings." Appellant's counsel, citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) then asserted that appellant lacked the ability to pay the fines and fees, particularly in light of the "large amount of actual restitution" she expected the court to impose after a future victim restitution hearing. She accordingly requested that the court stay the fines and fees. The court denied the request "at this time," and told counsel "we can review it if it turns out that he can't earn any sort of income while he's incarcerated. But we'll see."

Appellant now contends the court violated his federal and state due process and equal protection rights by imposing the fines and fees without first finding he had the ability to pay them. He further contends the prosecution bore the burden of proving he had the ability to pay, and that the absence of such proof requires the assessments to be stricken and the restitution fine suspended. Alternatively, he contends that imposing the fines and fees without considering his ability to pay rendered them unconstitutionally excessive. We reject these contentions.

In *Dueñas*, our colleagues in Division Seven concluded the imposition of fines and fees on an indigent unhoused mother who lacked the ability to pay was an unconstitutional violation of her due process rights. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1160.) "*Dueñas* held that it violates due process under the federal and state Constitutions to impose . . . court operations and facilities fees without first determining the convicted defendant's ability to pay them. [Citation.] In addition, 'to avoid serious constitutional questions' raised by the statutory restitution scheme, [*Dueñas* held that] the [trial] court must stay execution of the mandatory restitution fine unless the court determines that the defendant

45

has the ability to pay it." (*People v. Taylor* (2019) 43 Cal.App.5th 390, 397.)[11]

Even under *Dueñas*, however, fines and fees are properly imposed if a defendant has the ability to pay them. We follow the case law holding that a defendant bears the burden of showing he or she lacks an ability to pay. (E.g., *People v. Castellano* (2019) 33 Cal.App.5th 485, 490 ["a defendant must in the first instance contest in the trial court his or her ability to pay the fines, fees and assessments to be imposed and at a hearing present evidence of his or her inability to pay the amounts contemplated by the trial court"]; *People v. Kopp, supra*, 38 Cal.App.5th at p. 96.) We review the factual determination of ability to pay for substantial evidence. (*People v. Nilsen* (1988) 199 Cal.App.3d 344, 347.)

""Ability to pay does not necessarily require existing employment or cash on hand." [Citation.] "[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's present ability but may consider a defendant's ability to pay in the future." [Citation.] This include[s] the defendant's ability to obtain prison wages and to earn money after his release from custody.'" (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076.) Here, the trial court

---

[11]     The Supreme Court is currently considering whether a court is required to assess a defendant's ability to pay before imposing fines and fees and, if so, which party bears the burden of proof on that issue. (*People v. Kopp,* (2019) 38 Cal.App.5th 47, 96, review granted Nov. 13, 2019, S257844, Supreme Court Mins. Nov. 13, 2019 ["The issues to be briefed and argued are limited to the following: Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments? If so, which party bears the burden of proof regarding defendant's inability to pay?"].)

inferred that appellant had the ability to pay the fines and fees imposed upon him from his probable future wages, including his prison wages. That was a permissible inference supported by the minimal evidence before the court; appellant, who is currently 26 years old, has no identified infirmities precluding him from earning wages during his imprisonment and thereafter. The court also expressed willingness to revisit the issue if it transpired that appellant was unable to earn prison wages, which can range from $12 to $56 per month. (See *ibid*.) Any error in the court's failure to provide appellant an ability-to-pay hearing based on his unsupported assertion of indigency accordingly is harmless beyond a reasonable doubt. (See *People v. Johnson* (2019) 35 Cal.App.5th 134, 139-140, citing *Chapman*, *supra*, 386 U.S. at p. 24.)

## DISPOSITION

The jury's findings on the section 186.22 and 12022.53, subdivision (e)(1) enhancement allegations are vacated, and the related sentences thereon are stricken. The sentence on count 1 is also vacated, as is the sentence on count 4. On remand, the prosecution shall have the option to retry appellant on the section 186.22 and 12022.53, subdivision (e)(1) enhancements, and after the status of those enhancements is resolved (either by no retrial or by retrial and final resolution), the trial court shall resentence

appellant according to applicable law. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


WILLHITE, ACTING P.J.


CURREY, J.